# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**RICHARD KAIL,**

       **Petitioner/Counterclaim Defendant,**

**vs.**                                        **Case No. 8:15-cv-2719-T-27TGW**

**DIANE SUPERNANT,**

       **Respondent/Counterclaimant.**
_____/

## ORDER

**THIS CASE** was tried before the Court.

## I.    SUMMARY OF DECISION

Petitioner brought this action to partition real property owned by the parties as joint tenants

with right of survivorship. The property, located at 6811 Manasota Key, Englewood, Florida, is

legally described as:

> Lot 3, CARROLLAND SUBDIVISION, according to the Plat thereof, recorded in
> Plat Book 18, Page 39, of the Public Records of Sarasota County, Florida, together
> with a 3 foot walking easement over and across the Northerly 3 feet of Lot 2 of the
> Subdivision for ingress and egress to the Gulf of Mexico as recorded in O.R. Book
> 1983, Page 1710, Public Records of Sarasota County, Florida.
>
> AND
>
> Subject to a 20 foot easement for ingress and egress as shown on said plat recorded
> in Plat Book 18, Page 39, Public Records of Sarasota County, Florida.
>
> Parcel Identification Number: 0500170002

(Trustee's Deed, Petitioner's Ex. 47).

Respondent asserted a counterclaim seeking a declaratory judgment that she is the sole owner of 6811 Manasota Key and Petitioner's eviction. (Dkt. 20, Count One, ¶¶ 43-46; Count Six, ¶¶ 63-65). Additionally or alternatively, she seeks judgment against Petitioner for damages under contract, promissory estoppel, and/or unjust enrichment theories, alleging breach of promises to equally contribute to the parties' financial obligations and repay personal loans. (*Id.* at Count Two, ¶¶ 46-50; Count Three, ¶¶ 51-55; Count Five, ¶¶ 60-62). She also seeks damages for conversion of her Chris Craft boat. (*Id.* at Count Seven, ¶¶ 66-68). Finally, she seeks an injunction restraining him from forging her name or using her name to obtain credit, from causing waste, dissipation, or disrepair to Manasota Key, and requiring him to maintain the Manasota Key property. (*Id.* at Count Four, ¶¶ 56-59).

By way of background, the parties had a business and romantic relationship of approximately fifteen years, during which they purchased three parcels of real property in Minnesota and made other investments, culminating in the purchase of the Manasota Key property. They had an overarching agreement to "equalize" their real property contributions and expenses, evidenced by three written agreements, various emails and text messages they exchanged, and their course of conduct. The net proceeds from the sale of each property they acquired were effectively rolled over into the purchase of the next property.

Accordingly, this case essentially boiled down to an accounting for their respective contributions and expenditures during the course of their relationship. As will be discussed, that accounting demonstrates that Respondent made excess contributions to and expenditures on the properties over the course of their relationship, Petitioner failed to repay loans Respondent made to

him, and he converted her Chris Craft boat. The result is that Petitioner has a deficit of more than $500,000.

With respect to the partition action, the Manasota Key property was acquired using Respondent's funds exclusively, derived from her equity in 2895 Casco Point Road. And after the Manasota Key property was acquired, she funded improvements to the property, without any financial contribution from Petitioner. His contribution to the property was to have been the cost of remodeling, which never happened. Therefore, while he is a joint owner of 6811 Manasota Key and has established a right to partition by sale, Respondent proved by a preponderance of the evidence that she is entitled to a contribution from his share of the net sale proceeds. And she has proven by a preponderance of the evidence a right to separate judgments for breach of contract and conversion.

In sum, while the parties would ordinarily equally split the net proceeds from the partition sale, Respondent is entitled to contribution from Petitioner's share in the amount of $307,492.40, representing her excess contributions and expenditures toward the property to date. Jurisdiction will be reserved to determine credits to either party for expenses and improvements made to the property from the date of trial through its sale. Respondent is entitled to separate judgments for $14,579.25 for Petitioner's breach of agreements to repay personal loans, and $10,000 for Petitioner's conversion of her boat. Finally, Respondent is entitled to an injunction restraining Petitioner from (1) signing or using her name or credit to obtain credit for himself or anyone else, (2) signing any document in her name, and (3) causing waste, dissipation, or disrepair to 6811 Manasota Key prior to its sale.

## II.     FINDINGS

Petitioner and Respondent had a relationship of approximately fifteen years. During the relationship, they successively acquired three parcels of real property which they used as residences, agreeing to equally share in the cost and expenses associated with the properties. These properties were located at 3866 Sunset Drive, Spring Park, Minnesota, 2895 Casco Point Road, Orono, Minnesota, and 6811 Manasota Key, Englewood, Florida.[1] The parties' course of conduct was to roll the proceeds from the sale of one residence over to their next residence.

### A.     Petitioner's Memory Impairment

During trial, Petitioner claimed loss of memory, describing having suffered a traumatic brain injury that impairs his short and long term memory. He also testified that his memory problems are exacerbated when under stress. At several points during cross examination, he testified that he was under stress that makes it more difficult for him to remember things.

According to Petitioner, his brain injury occurred in 1996 before he met Respondent, and his memory has been worsening over the past few years. However, he provided no supporting medical records. For her part, Respondent testified that during her relationship with Petitioner, he never mentioned a brain injury that impaired his memory. And she never observed him suffering from memory problems.

Petitioner's testimony about his memory impairment poses something of a dilemma for him. If he in fact suffers from short and long term memory impairment, and the pressure of testifying made it even more difficult for him to recall events and conversations, his testimony about past

---

[1] They also invested in real property referred to as the Boy Lake Property, but lost money on that investment. Respondent makes no claim related to that property.

events is necessarily unreliable. But if his testimony that he has no memory problems is true, that reflects poorly on his credibility. Under either scenario, therefore, his recollection of past events and conversations is entitled to little, if any weight, particularly when contradicted by Respondent's testimony or the documentary evidence. Significantly, Respondent either feigned memory loss or was evasive when confronted with the facts. And to the extent there was conflict between Petitioner and Respondent's testimony with respect to any material subject, Respondent was the more credible witness.

### B. The Parties' Agreements Regarding Their Minnesota Residential Properties

The first real property the parties owned was 3866 Sunset Drive. (HUD Statement, Resp. Ex. 8).[2] Respondent made the down payment and secured a mortgage to finance the purchase. The parties executed a written agreement on June 14, 1999 to govern Sunset Drive. (Resp. Ex. 9). Respondent testified that the agreement reflects a specific method for implementing an oral agreement between the parties to equally split expenses related to the property.

Respondent maintained meticulous records of the parties' respective contributions to and expenditures on Sunset Drive, and of their respective contributions to and expenditures on their next two residences. (Payment Spreadsheets for 3866 Sunset Drive, 2895 Casco Point Road, and 6811 Manasota Key, Resp. Exs. 2-3, 5-7).[3] These spreadsheets were reliable and compelling. Significantly,

---

[2] Only Respondent was listed on the HUD statement for 3866 Sunset Drive, (Resp. Ex. 8), but she subsequently conveyed title by quit claim deed to herself and Petitioner, based on his promise to pay half of the payments and expenses, including the mortgage payments. (Resp. Ex. 10).Respondent testified that Petitioner was not originally on the mortgage because he had bad credit, and including him as a co-signer would have increased the interest rate. Petitioner failed to make the agreed payments.

[3] Over objection, the spreadsheets were admitted as summaries under Federal Rule of Evidence 1006, because the listed transactions were supported by documentary evidence such as cancelled checks and credit card statements. *See* (Resp. Exs. 2-3, 5-7). The spreadsheets even accounted for, among other expenses and contributions, the value of the parties' respective labor in remodeling 2895 Casco Point Road.

as will be discussed, the spreadsheets confirm that when the parties purchased Manasota Key, Petitioner's deficit was $510,119.99, which included an accounting for the parties' respective contributions to and expenditures on 2895 Casco Point Road (deficit of $436,988.62) and 3855 Sunset Drive (deficit of $73,131.37). (Resp. Ex. 5).

The parties purchased the 2895 Casco Point property on August 8, 2003. (HUD Statement, 2895 Casco Point purchase, Resp. Ex. 15). They sold 3866 Sunset Drive on June 28, 2004. (HUD Statement, 3866 Sunset Drive sale, Resp. Ex. 16). When Sunset Drive was sold, those proceeds were rolled into Casco Point. Respondent calculated, with supporting documentation, that when Sunset Drive was sold, Petitioner had a total deficit of $73,131.37 from his share of the expenses associated with that property. (Payment Spreadsheet for 3866 Sunset Drive, Resp. Ex. 2). While the parties did not have a written agreement governing 2895 Casco Point Road, Respondent credibly testified that they orally agreed to equally split the expenses associated with the property.

From 2005 to 2006, they obtained loans secured by mortgages on Casco Point of approximately $450,000, and used those funds to make loans to EPC Solutions, a company owned by Petitioner's brother. *See* (2895 Casco Point Refinance Agreement, Resp. Ex. 17) (noting that the loans to EPC Solutions secured by 2895 Casco Point totaled $450,000). Respondent also loaned EPC Solutions $50,000.00 from her personal funds. Petitioner agreed to be responsible for any losses they suffered, since he was positive that there would be no losses. The parties ultimately recovered only a portion of the funds loaned to EPC Solutions ($220,000) in a settlement before it filed for bankruptcy protection.[4]

---

[4] When EPC Solutions defaulted, the parties engaged an attorney to pursue EPC. Although they agreed to share the litigation costs, Respondent paid approximately $35,000 toward those costs, and Petitioner paid only $5,000. A settlement produced $220,000 before EPC filed for bankruptcy protection. A subsequent distribution of $13,000 from EPC's bankruptcy is held by the attorney in trust. The court declines to address to whom these proceeds should be paid.

The parties executed a written refinancing agreement for 2895 Casco Point on February 3, 2013. (Resp. Ex. 17). The agreement provided that they would obtain a new loan of approximately $512,000, and Respondent would pay off an existing loan. (*Id.*). With respect to the new $512,000 loan, the parties intended that a "balance owed by [EPC Solutions] totaling $110,000 in principal" would be put towards the loan, and "the remaining principal of approximately $400,000 is the responsibility of Richard L. Kail." (*Id.*). The agreement also provided for the parties' equitable split of property taxes, insurance, and the closing costs for the refinancing. (*Id.*).[5] Petitioner did not make the payments required by the refinancing agreement. Effectively, therefore, the $450,000 borrowed against Casco Point Road was Respondent's equity.

Respondent testified that Petitioner's failure to pay his share of expenses was a frequent topic of conversation, and he repeatedly promised that he would pay his share. He also acknowledged during those conversations that she owned 100 % of the equity in 2895 Casco Point Road because she had made all of the payments. Petitioner did not recall any conversations with Respondent about equally splitting the expenses for 3866 Sunset Drive or 2895 Casco Point, and does not recall any conversations about owing money to her to equalize his share of the contributions. According to Petitioner, he has trouble recalling verbal conversations regarding the properties because their arrangement was fluid and constantly changing. He testified that he did not understand these conversations as oral agreements, and he pointed to the fact that she never had him sign an agreement specifically saying he owed anything. As noted, his testimony is not credible.

---

[5] The refinancing agreement also includes a provision designed to repay Respondent for her $50,000 personal loan to EPC Solutions, plus interest. *See* (Resp. Ex. 17) ("Once the [EPC Solutions] debt against the house is paid in full (original loans totaling $450,000) Diane Supernant will start receiving payments of $7,000 each month until paid in full approximately 7.14 months. In the eight [sic] month, Diane M. Supernant will be paid interest in the amount of $3,000.").

The Court finds that the parties had an overarching agreement to equally share the financial obligations associated with their Minnesota residences, and on occasion memorialized their specific agreement for achieving an equitable split of their contributions. *See* (Sunset Drive Agreement, Resp. Ex. 9; 2895 Casco Point Refinance Agreement, Resp. Ex. 17). The evidence demonstrates, starting with the purchase of Sunset Drive, that Respondent paid the up-front costs for the properties and Petitioner agreed to pay a greater share of the subsequent expenses to equalize their contributions, but consistently failed to do so.Notwithstanding, the financial records demonstrate that Petitioner contributed substantially less than Respondent to the two Minnesota properties from 1999 to 2013. *See* (Payment Spreadsheets for 3866 Sunset Drive and 2895 Casco Point, Resp. Exs. 2-3, 5-6).

Respondent testified, with supporting documentation, that the difference between their contributions, by the time of the 2895 Casco Point refinancing agreement, was approximately $500,000. *See* (Payment Spreadsheet for 2895 Casco Point, Resp. Ex. 5).[6] And her testimony describing Petitioner's deficit is corroborated by the refinancing agreement, which provided that Petitioner would be solely responsible for a loan in the amount of approximately $512,000, minus expected repayments from EPC Solutions, that never came about. (Resp. Ex. 17).

Respondent's recollection of events is supported by documentation of the parties' respective payments towards the properties. And notwithstanding Petitioner's claimed memory issues, he testified that he understood that he and Respondent were partners in these real property transactions. His testimony that she made the up-front payments towards the properties without an overarching oral agreement for him to equally contribute is simply not credible.

---

[6] Petitioner's contention that he should receive a credit for reduced real estate commissions because his mother accepted reduced commissions is rejected. The parties never agreed that the reduced commissions would constitute a contribution for Petitioner.

### C.       The Parties' Agreement Regarding 6811 Manasota Key

Respondent credibly testified that leading up to the sale of 2895 Casco Point and the purchase of 6811 Manasota Key, Petitioner acknowledged that she owned all of the equity in Casco Point because she had made all the payments, and that the proceeds from the sale would belong to her. The closing of 2895 Casco Point resulted in the issuance of a cashier's check for $513,971.70, the net proceeds from the sale (Pet. Ex. 59). With Petitioner's consent, Respondent deposited those funds into her personal account, (Wells Fargo High Yield Savings Account Activity Summary for September 2013, Resp. Ex. 7). She used the funds to pay the purchase price of Manasota Key, plus closing costs, in the amount of $495,685.02.[7]

The parties agree that they purchased 6811 Manasota Key as their retirement residence. The October 17, 2013 deed conveys title to them as joint tenants with right of survivorship. (Pet. Ex. 47). According to Respondent, Petitioner acknowledged that she owned 100 percent of the equity in Manasota Key because she paid the entire purchase price. She also testified that they agreed that in exchange for her paying the purchase price, Petitioner would obtain and make payments on a construction loan in an equivalent amount to remodel the property. That never occurred.

Approximately six months after the purchase of Manasota Key, Petitioner signed a document dated April 24, 2014 that states, in his handwriting, "I Rick Kail will pay for remodeling the House @ 6811 Manasota Key Road Englewood, FL." (Resp. Ex. 19). Respondent had asked for him to put something in writing because six months had passed from the purchase of Manasota Key, but he had not obtained a job, obtained a construction loan, or hired anyone to remodel the property. Petitioner

---

[7] Respondent actually paid $496,286.63, having received a refund from the seller of $601.61. *See* (Payment Spreadsheet for 6811 Manasota Key, Resp. Ex. 7).

sent her a text message in October 2015. The text discusses his efforts to find someone to remodel the "house in Florida" and states, "I told you I would go along only if you covered all costs above five hundred." (Resp. Ex. 46).

For his part, Petitioner testified that he agreed to purchase 6811 Manasota Key with Respondent only if they would be deemed "square," meaning that any deficits from his share of the financial obligations for 3866 Sunset Drive and 2895 Casco Point, as well as his share of the financial responsibility for their losses from the EPC Solutions loans, would no longer be owed to her. According to Petitioner, they agreed that the proceeds from the sale of 2895 Casco would be treated as their equal property. He testified that David Schnulle overheard Respondent agree to these terms. On the other hand, Respondent testified that Petitioner never asked her to forgive his deficits, and she never agreed that he did not owe her any money. Respondent's version of these events is credible. Petitioner's is not.

Schnulle avers that he heard "Rick say to Diane: 'If we purchase this home, all other issues regarding property or money are forgotten and we are square" and heard "Diane Supernant respond[] 'Yes.' " *See* (Declaration of David Schnulle, Dkt. 52-1 at ¶ 5). During his deposition, he acknowledged he knows nothing about Petitioner and Respondent's personal or financial relationship, does not know if they have any oral or written agreements regarding their properties, did not know that they used the equity from 2895 Casco Point to purchase Manasota Key, was not aware of any agreements they had about the purchase or remodeling of Manasota Key, and that he might not have the full context for any statements he heard. *See* (Transcript of Deposition of David Schnulle, Dkt. 95-1 at 20:25, 21:1-13, 22:12-25, 23:1-15, 24:6-24, 26:5-25, 27:1-9, 46:3-14).

Indeed, Schnulle admitted that he left the lanai where Petitioner was having the phone conversation with Respondent several times to scan documents. He estimated that each of these instances took about one to three minutes, and stated that he could not hear the conversation when he was scanning documents. Schnulle, therefore, missed several minutes of the conversation that could have provided more information and context for the statement he claims to have overheard. *See* (Transcript of Deposition of David Schnulle, Dkt. 95-1 at 40:9-25, 41:1). No weight is therefore given to his testimony.

Ultimately, Petitioner prepared a March 28, 2015 memorandum regarding 6811 Manasota Key he presented to Respondent. (Resp. Ex. 41). In it, he proposed "to use the equity from our house at 6811 Manasota Key Road to rebuild our financial security . . . with real estate investing." (*Id.* at p. 1). The 14 page memorandum outlined a plan for Petitioner to work with Schnulle to flip real properties for a profit. *See generally* (*id.*). Respondent testified that Petitioner indicated he intended to use the proposed real estate investments to pay for the remodeling. She did not, however, agree to the proposal.

Considering the evidence, the Court finds there was an oral agreement between the parties to equalize their contributions to the purchase and improvement of 6811 Manasota Key, consistent with their overarching agreement governing the real properties acquired and used as residences during their relationship. They rolled the proceeds from the sale of 2895 Casco Point over to the purchase price and closing costs associated with Manasota Key, but agreed that the proceeds from the sale of Casco Point would be Respondent's exclusive property, in recognition of Petitioner's outstanding deficit when Casco Point was sold. As noted, his contribution to the Manasota Key property was to have been the remodeling of the property, which never happened. His written

statement in April 2014 evidences his intent to pay for the remodeling of 6811 Manasota Key as his contribution, (Resp. Ex. 19), and the later text message confirms his agreement to pay up to $500,000 in remodeling costs. (Resp. Ex. 46).

### D. The Parties' Respective Financial Contributions to 6811 Manasota Key

The expenses associated with 6811 Manasota Key include the purchase price, insurance, taxes, and the cost of improvements. Respondent created a spreadsheet summary of all payments associated with 6811 Manasota Key, with supporting bank records, checks, and credit card records. (Payment Spreadsheet for 6811 Manasota Key, Resp. Ex. 7). Those records demonstrate that she paid the entire $495,685.02 purchase price with two wire transfers from her personal account.[8]

Improvements to the property included a pool and screen, improvements to a lanai, a new dock, landscaping, and associated architectural drawings. The cancelled checks, invoices confirming cash payments, and credit card statements confirm that Respondent paid for these improvements. (Payment Spreadsheet for 6811 Manasota Key, Resp. Ex. 7).[9] Her payments totaled $70,294.62. (*Id.*).[10] Petitioner offered no evidence that he contributed financially to improving the property.

---

[8] The HUD Statement for 6811 Manasota Key shows a total price of $500,417.50, including the $500,000 contract sale price and $417.50 in closing costs. (Resp.Ex. 18). Respondent paid a $50,000 down payment via wire transfer on October 10, 2013, (Resp. Ex. 7), and received a credit in the amount of $4,732.48 on the HUD statement for unpaid property taxes, (Resp. Ex. 18). The amount due at closing, therefore, was $445,685.02. (Resp. Ex. 18). Respondent paid $446,286.63 via wire transfer on October 15, 2013, and later received a refund of $601.61. (Resp. Ex. 7). The Court finds that the wire transfer fees that Respondent paid, which total $60, are not charges associated with the purchase of 6811 Manasota Key.

[9] Respondent's financial records of improvements to 6811 Manasota Key also include checks she made out to Petitioner for improvements. *See* (Resp. Ex. 7). However, there is no evidence establishing how Petitioner actually used the funds after he received the checks. Any improvements paid for from these checks, therefore, will not be credited to either Petitioner or Respondent.

[10] The Court finds that amounts Respondent included for a home inspection of $775.00 and equity line payments of $3,914.99, will not be credited to Respondent as contributions to 6811 Manasota Key, since they are not charges associated with the property. *See* (Resp.Ex. 7).

Expenses associated with 6811 Manasota Key included home insurance, flood insurance, and taxes.[11] (*Id.*). The documentary evidence supporting these expenses includes cancelled checks and credit card statements. (*Id.*). Respondent's payments for expenses totaled $48,999.54. (*Id.*). Petitioner provided no evidence that he paid any expenses associated with 6811 Manasota Key.

Respondent's total financial contribution to 6811 Manasota Key, including the purchase price, improvements, and expenses, totaled $614,979.18.[12]

### E. Petitioner's Conversion of Respondent's Chris Craft Boat

Respondent owned a 1936 Chris Craft, which she restored for approximately $37,000. (Chris Craft Registration, Resp. Ex. 23; Boat repair receipts and checks, Resp. Ex. 24). After it was moved to Florida, Petitioner told her that he had a potential buyer. She agreed that he could trade the boat on her behalf in exchange for a Key West boat and $6,500. However, he told her after the trade that he only received $5,000, and the Key West boat. And she effectively received only $4,500 of the proceeds ($2300 cash and $2200, which Petitioner applied toward the new pool). (Payment Spreadsheet for 6811 Manasota Key, Respondent's Ex. 7). Actually, Petitioner received the <u>entire</u> $6,500 for the boat, but deposited $1,500 of the proceeds into his own bank account without informing her. (Petitioner's Wells Fargo checking account statement for January 2015, Respondent's Ex. 27). And he titled the Key West boat in his name and sold it without informing her. *See*

---

[11] Respondent also listed truck rentals of $2,816.87, checks she made out to Petitioner for moving expenses of $3,100, and checks to Petitioner for other expenses of $1,725. *See* (Resp. Ex. 7). These amounts will not be credited to Respondent as contributions to 6811 Manasota Key, because they are not clearly charges associated with the property.

[12] As noted, Petitioner did not financially contribute towards the purchase price, improvements, or expenses associated with the property. He did not testify about any contributions or improvements that he made to the property, and did not submit any documentary evidence of contributions. Further, the evidence shows that he did not have an income from which he could have financially contributed to Manasota Key. He has not been employed since he began residing at Manasota Key and Respondent occasionally made personal loans to him for living expenses.

(Certificate of Title, Resp. Ex. 26; Picture of Key West boat, Respondent's Ex. 28). She first learned that the boat had been sold during his deposition.

Petitioner testified that he could not recall to whom he sold the Key West boat or the price. His testimony is not credible, and indeed, was evasive. He told Respondent that the Key West boat had a value of approximately $8,000 to $10,000. The Court finds therefore that the value of the Key West boat was at least $8,000, the minimum she expected to receive from the trade of the Chris Craft boat.

### F. Petitioner's Forgery of Respondent's Signature to Obtain a Credit Card

On September 15, 2012, Petitioner applied for and obtained a Wells Fargo credit card for PID Technologies. (Agreement & Personal Guarantee, Resp. Ex. 20). The application indicates that he and Respondent signed the application as guarantors for PID Technologies' business line of credit. (*Id.*).[13] However, Respondent did not sign the application. Petitioner signed her name without her permission. Respondent was in the parking lot outside the Wells Fargo when Petitioner was in the bank signing her name. She introduced records from her Wells Fargo checking account showing that she withdrew funds at a Wells Fargo ATM on September 15, 2012, confirming that she was outside the bank while Petitioner was inside obtaining the credit card. (Resp. Ex. 22). She testified that this is not the first time he has attempted to put forge her name on PID Technologies documents.

Petitioner testified that he had Respondent's authorization to sign her name. However, he admitted that he did not discuss it with her and she did not give him permission. Petitioner also

---

[13] The testimony of both parties indicates that Petitioner would not have been able to obtain the credit card for PID Technologies if he was the only guarantor because of his poor credit rating.

denied that Respondent was in the parking lot outside the bank while he was inside obtaining the credit card. His testimony is not credible.

Respondent discovered that Petitioner had forged her name on the credit card application in November 2014. She learned that Petitioner had maxed out the credit card's limit, the debt was delinquent, and the delinquent debt was negatively affecting her credit rating. After she confronted him, she agreed to loan him the money so that he could pay the debt in exchange for his agreement to repay her. Understandably, she made a check out to Petitioner's mother for $8,079.25 to ensure that the credit card was paid (Resp. Ex. 21). At trial, Petitioner stipulated through counsel that he owes her the money for the credit card debt.

### G.    *Respondent's Personal Loans to Petitioner*

Respondent made personal loans to Petitioner in exchange for his promise to repay her. The documents demonstrate that she made checks out to Petitioner for $4,000 on March 27, 2015 and $2,500 on August 25, 2015 as personal loans. (Checks dated 03/27/2015 and 08/25/2015, Resp. Ex. 7). As noted, Respondent also testified, and Petitioner stipulated, that he owes her the $8,079.25 she gave him to pay the debt on the PID Technologies credit card. *See* (Check to Carol Kail, Resp. Ex. 21). And a text message from Petitioner to Respondent on August 28 states "I will get you the email stating I will repay $16,500.00 ASAP." (Resp. Ex. 31). Accordingly, the Court finds that Respondent made $14,579.25 in personal loans to Petitioner which remain outstanding.

## III.    CONCLUSIONS OF LAW

### A.    *The 6811 Manasota Key Property Shall be Partitioned by Sale with a Credit to Respondent for Her Excess Payment of Expenses Associated with the Property*

As noted, Petitioner has established the right to partition 6811 Manasota Key. *See* Fla. Stat. § 64.041 ("The [partition] complaint shall allege a description of the lands . . . the names and places

of residence of the owners . . . [and] the quantity held by each."). The requirements for partition of real property are satisfied. *See Carlsen v. Carlsen*, 346 So. 2d 132, 133 (Fla. Dist. Ct. App. 1977).

A partition by sale may be ordered when it is readily apparent that a physical partition is not practical. *See id.* (citing Fla. Stat. § 64.061(4)). The parties agree that the property is not susceptible to physical partition, and that it cannot be physically shared between them. Accordingly, a partition by sale is necessary. The parties will have an opportunity to arrange a private sale. If they fail to do so, a special magistrate or the Clerk will be authorized to conduct a sale of the property. *See* Fla. Stat. § 64.041(4); *see also Carlsen*, 346 So. 2d at 134 ("The trial court may provide a reasonable period of time for the parties to conclude any private arrangements for sale or disposition of their . . . home, subject, of course, to approval of the court.").

After the right to partition by sale is established, a two-step analysis is undertaken to: (1) determine each owner's percentage of ownership, and (2) calculate the proportionate share owed to each owner from the proceeds of a partition for reimbursable investments. *See Biondo v. Powers*, 743 So. 2d 161, 163-64 (Fla. Dist. Ct. App. 1999).

When one party contributes the full purchase price for property but allows the property to be jointly titled with another, a gift is presumed. *See O'Donnell*, 823 So. 2d at 198 (citing RESTATEMENT (SECOND) OF TRUSTS § 441 cmt. e (1959)). While Respondent has rebutted this presumption by evidence that she did not intend to gift an ownership interest in Manasota Key to Petitioner, she has failed to establish that he is not an owner of an equal, undivided legal title in the property. The deed conveying title to the parties as joint tenants with right of survivorship raises a rebuttable presumption that they are owners of equal, undivided interests in 6811 Manasota Key. *See* (Pet. Ex. 47); *O'Donnell v. Marks*, 823 So. 2d 197, 199 (Fla. Dist. Ct. App. 2002).

16

Respondent's counterclaim seeks a declaratory judgment that she is the exclusive owner of 6811 Manasota Key and eviction of Petitioner in Counts One and Six, respectively. (Dkt. 20). Respondent contends that she agreed to jointly title Manasota Key only because he agreed to equally contribute to the property, but that he breached that agreement, and she made all payments for the property. *See* (*id.*). Respondent's hindsight regret that she jointly titled Manasota Key does not support a finding that she is the sole owner of the property. The evidence establishes that the parties intended that they would jointly own the property when they purchased it. *See Moore v. Moore*, 401 So. 2d 841, 843 (Fla. Dist. Ct. App. 1981) ("[Grantor] now regrets putting the deed in joint names, but he was unable to testify he did not intend a conveyance to both when he executed the deed. His intent at the time, not six years later, is the critical factor.").

In sum, the parties intended that Petitioner would receive an undivided one-half interest in the property in exchange for assuming half of the anticipated financial responsibilities associated with the property. Having determined that Petitioner and Respondent own an undivided one-half interest in 6811 Manasota Key, each would otherwise be entitled to half of the proceeds from the sale of the property. *See Biondo*, 743 So. 2d at 163-64. However, Respondent is entitled to contribution from the proceeds of the sale for Petitioner's proportionate share of the expenses associated with the property. *Id.* at 164 ("As a general rule, co-tenants have a mutual obligation to pay charges upon the co-owned property. Thus, they are each ultimately liable for his or her proportionate share of the obligations or expenses of the property . . . ." (citations omitted)). Under the formula established by

*Biondo*, Respondent's credit will be equal to 50 % of her excess payments associated with the property. *Id.*[14]

That Petitioner applied for and received a homestead exemption for 6811 Manasota Key is of no moment. Homestead protection does not exempt him from the obligation to reimburse Respondent for his proportionate share of the financial obligations associated with the property. *See, e.g.*, *Hawkins v. Hawkins*, 895 So. 2d 1155, 1156 (Fla. Dist. Ct. App. 2005) (holding that after a dissolution of marriage that made former husband and wife joint tenants of what had been the marital residence, the former husband was entitled during partition to an accounting of his excess contributions to the property after the dissolution). Unmarried cotenants "have equal responsibility in making all payments necessary to maintain their ownership of the property," regardless that one cotenant resides at the property and one does not. *See, e.g.*, *Kelly v. Kelly*, 583 So. 2d 667, 668 (Fla. 1991).

To summarize, Respondent's contributions for expenses associated with 6811 Manasota Key total $614,979.18. *See Biondo*, 743 So. 2d at 164 (a party may be credited for payment of the purchase price in a partition accounting).[15] As a joint tenant with an equal responsibility for the charges associated with Manasota Key, Petitioner is responsible for one-half of Respondent's excess

---

[14] In *Biondo*, each party paid approximately $134,000 for the real property. One of the parties then paid all of the interest, taxes, insurance, and other expenses associated with the property. Accordingly, by the time of the partition sale, one party's contribution to the property equaled $760,000, and the other party's contribution equaled only the $134,000 paid at closing. The court held that the proper method for calculating the higher-paying party's credits was to subtract $134,000 from $760,000 and to divide this number in half, for a total of approximately $313,000 owed to the party who made the greater investment. *See* 743 So. 2d at 163-64.

[15] Although the parties in *Biondo* purchased the real property as an investment, while Petitioner and Respondent purchased 6811 Manasota Key as a retirement residence, *Biondo* instructs that the question of whether to include the purchase price in a partition accounting is determined by the parties' intent. *See* 743 So. 2d at 162. Here, the evidence shows that the parties intended that the $500,000 purchase price be considered Respondent's contribution to the property, and that Petitioner's equal contribution would be made in other ways. Accordingly, it is necessary to consider the $500,000 purchase price for Manasota Key as part of the partition accounting.

payments, which is $307,489.59. Accordingly, 6811 Manasota Key shall be partitioned by sale. The net proceeds are to be deposited with the Clerk of the United States District Court for the Middle District of Florida. The parties are each to be credited with half of the net proceeds, commensurate with their undivided, one-half interest in the property. Respondent is entitled to a contribution from the net proceeds in the amount of Petitioner's proportionate share of the total charges paid for Manasota Key to date, $307,489.59. Jurisdiction is reserved to conduct a final accounting of additional financial contributions to Manasota Key from the date of trial to the date of sale, and to allocate credits accordingly, upon motion of either party. *See* Fla. Stat. § 64.051; *O'Donnell*, 823 So. 2d at 199.

**B.    *Respondent Is Entitled to Final Judgment Against Petitioner for His Breach of Agreements to Repay Personal Loans***

Respondent sought damages for breach of three separate agreements: (1) an agreement to pay equal shares of the payments and expenses associated with their jointly owned real properties; (2) an agreement to pay equal shares of the loans against 2895 Casco Avenue; and (3) personal loans she made to Petitioner in exchange for his repayment of the loans. (Counterclaims, Dkt. 20 at ¶¶ 47-49). The evidence does not establish Respondent's entitlement to damages for breach of the first two agreements, but supports final judgment in her favor for Petitioner's breach of the agreement to repay the personal loans.

The first two agreements relied on by Respondent relate to their residences. Their specific agreements relating to the Minnesota residences, and the loans against 2895 Casco Point, were effectively rolled into and encompassed within their oral agreement relating to 6811 Manasota Key. The parties reconciled the amounts Petitioner owed for his share of the expenses associated with the

Minnesota properties and the loans against Casco Point by agreeing that the proceeds from the sale of Casco Point would be treated as Respondent's contribution to Manasota Key.

The relief Respondent seeks for Petitioner's breach of the agreement relating to 6811 Manasota Key is addressed through partition sale. *See McFall v. Trubey*, 992 So. 2d 867, 870 (Fla. Dist. Ct. App. 2008) (holding in a partition action that "[t]he amounts the McFalls seek are not 'damages' . . . . they are simply 'credits' "); *see also Marrouche v. Homasey*, 532 So. 2d 92, 94 (Fla. Dist. Ct. App. 1988) (holding it was error for trial court to award damages to a party for breach of contract where court already directed a partition sale and an accounting to determine entitlement to credits).

As noted, Respondent made personal loans to Petitioner which were never paid. She is entitled to final judgment of $14,579.25 against Petitioner for breach of contract.

### C. The Existence of a Contract Precludes Judgment in Respondent's Favor on Her Alternate Theories of Promissory Estoppel and Unjust Enrichment

As noted, based on the testimony and the documentary evidence, there existed an overarching, oral agreement between the parties to equally share the financial obligations associated with the real properties they purchased and used as residences during their fifteen-year relationship. The existence of a contract, whether oral or written, precludes judgment on theories of promissory estoppel or unjust enrichment. *See Doe v. Univision Television Grp., Inc.*, 717 So. 2d 63, 65 (Fla. Dist. Ct. App. 1998); *Williams v. Bear Sterns & Co.*, 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998). Accordingly, Respondent is not entitled to judgment on her claims of promissory estoppel and unjust enrichment in Count Three and Count Five of her counterclaim.

### D. Respondent is Entitled to Final Judgment Against Petitioner for His Conversion of the Chris Craft Boat

Petitioner committed conversion of Respondent's Chris Craft boat. "Conversion is an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. Dist. Ct. App. 2011) (citations and quotation marks omitted). The circumstances of Petitioner's conversion are not unlike those of an abuse of bailment, because he exercised control over the Chris Craft boat with Respondent's permission. However, he abused that control by failing to remit the proceeds of the trade or deliver the Key West boat to Respondent. "[W]rongful destruction or disposal of personal property by a bailee, contrary to the terms, terminates the trust and works a disseisin of the true owner, and action for conversion will lie." *Star Fruit Co. v. Eagle Lake Growers*, 33 So. 2d 858, 860 (Fla. 1948); *see also National Union Fire Ins. Co. of Pa. v. Carib Aviation, Inc.*, 759 F.2d 873, 878 (11th Cir. 1985) (per curiam) (recognizing that a conversion claim may lie against a bailee). Respondent authorized Petitioner to trade her boat in accordance with specific terms. His violation of those terms constitutes an act of dominion wrongfully asserted over the boat and a deprivation of her property.

The measure of damages for conversion is the value of the property converted. *See Star Fruit Co.*, 33 So. 2d at 861. The evidence of value of the Chris Craft boat consists of "what a willing buyer would pay to a willing seller, neither party being obligated to act." *See Department of Agric. & Consumer Servs. v. Polk*, 568 So. 2d 35, 41 (Fla. 1990) (citing *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 632 (1961)). Respondent agreed to trade the Chris Craft boat for the Key West boat and $6,500. The value of the Chris Craft boat was $8,000. She received $4,500.

Accordingly, the measure of her damages for Plaintiff's conversion of the boat is $10,000. Final Judgment will therefore be entered for $10,000.

### E.    *Respondent is Entitled to an Injunction*

Respondent's counterclaim includes a cause of action for an injunction restraining Petitioner from forging her name or attempting to obtain credit by using her name or credit, restraining him from taking action that would cause waste, dissipation, or disrepair to 6811 Manasota Key, and requiring him to maintain Manasota Key by paying utilities and expenses. (Dkt. 20 at ¶¶ 57-58). A plaintiff seeking injunctive relief must establish (1) an irreparable injury; (2) inadequate remedies at law; (3) the balance of the hardships between the plaintiff and defendant shows that an injunction is warranted; and (4) an injunction is not contrary to the public interest. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).

Respondent has established entitlement to the injunction. Petitioner forged Respondent's name on a Wells Fargo credit card application without her permission in order to obtain a credit card for PID Technologies, (Resp. Ex. 20), maxed out the card, and allowed the debt to go into default, and damaged her credit rating. As a result, Respondent suffered irreparable injury and her remedy at law is inadequate.

The balance of hardships supports an injunction. Signing Respondent's name as a personal guarantor for a line of credit imposed a financial burden on her and caused harm to her credit rating. By comparison, restraining him from forging her name or using her credit to obtain credit imposes no burden on him. An injunction restraining Petitioner from signing documents on behalf of Respondent serves the public interest by, among other things, ensuring the public's ability to rely on

the validity of signatures and by avoiding the imposition of financial liabilities on unsuspecting individuals.

Respondent has also established entitlement to an injunction restraining Petitioner from causing waste, dissipation, or disrepair to 6811 Manasota Key prior to the sale of the property. An injunction is a proper tool for preventing waste regardless of any showing of irreparable harm. *See, e.g.*, *Knabb v. Hill*, 149 So. 335, 335 (Fla. 1933).

That said, any waste, disrepair, or dissipation of Manasota Key prior to its sale that negatively affects its marketability would cause harm to Respondent that is not easily addressed at law. While the hardship of an injunction preventing waste is greater on Petitioner because he resides on the property, this burden is not substantial and does not weigh against entry of an injunction. The balance of interests therefore favors Respondent. Further, ensuring that no waste, disrepair, or dissipation occurs at the property prior to its sale serves the public interest by maximizing the value of the property and ensuring its marketability. An injunction will therefore be entered restraining Petitioner from taking any action that causes waste, disrepair, or dissipation to the Manasota Key property while he continues to reside there.

Respondent has not established entitlement to an injunction requiring Petitioner to pay utilities and expenses associated with 6811 Manasota Key until the sale of the property. Respondent has alternative remedies available if she pays additional expenses associated with Manasota Key prior to the sale. The Court has reserved jurisdiction to determine the final amount of each party's proportionate share of expenses paid until the sale, and to adjust the final credits awarded to the party paying the greater share accordingly. *See O'Donnell*, 823 So. 2d at 199.

## IV.    CONCLUSION

The real property located at 6811 Manasota Key described above shall be partitioned by sale. The parties have until **October 31, 2017** to effectuate a private, cash sale of the property. Should they procure a buyer, they shall file a joint motion for approval of the sale, attaching a copy of the contract, an estimate of closing costs, the proposed closing agent, and the proposed disbursement directions of the sale proceeds. If they fail to procure a purchaser, jurisdiction is reserved to appoint the Clerk to conduct a public auction to the highest bidder pursuant to § 64.071, Fla. Stat.

The net proceeds from the sale shall be deposited in the court registry. Jurisdiction is reserved to authorize withdrawal of funds from the proceeds of the sale for the payment of costs, taxes, and attorneys' fees pursuant to § 64.081, Fla. Stat. Respondent shall receive a credit from Petitioner's share of the proceeds in the amount of $307,489.59, which is equal to 50 percent of Respondent's excess payments associated with Manasota Key to date.

**FINAL JUDGMENT** is entered in Respondent's favor on Count Two of her Counterclaim for $14,579.25, for which let execution issue. **FINAL JUDGMENT** is entered in Respondent's favor on Count Seven of her Counterclaim for $10,000.00, for which let execution issue.

**FINAL JUDGMENT** is entered in Respondent's favor on Count Four of her Counterclaim. Petitioner is restrained from (1) signing Respondent's name on any document; (2) from taking steps to obtain credit for himself, for PID Technologies, Inc., or for any other individual or entity by using Respondent's name or credit; and (3) from taking any action that would cause waste, dissipation, or disrepair to 6811 Manasota Key.

24

Counts One, Count Three, Count Five, and Count Six of Respondent's Counterclaim (Dkt. 20) are dismissed.

**DONE AND ORDERED** this 7th day of July, 2017.

*/s/ James D. Whittemore*

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record